# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| ARIEL SCHLOSSER, ] | |
| ] | |
| Plaintiff, ] | |
| ] | |
| vs. ] | Case No: 3:20-CV-00190 |
| ] | |
| VRHABILIS, LLC, ] | JURY DEMAND |
| ] | |
| Defendant. ] | |

## COMPLAINT

Comes now the Plaintiff, Ariel Schlosser, by and through counsel and for cause of action will respectfully show to the Court as follows:

### JURISDICTION & VENUE

1. This action involves the application of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e, *et seq*.

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

3. Defendant's principal place of business and relevant employment records are located in Knoxville, Tennessee; therefore, proper venue for this action lies within the Eastern District of Tennessee pursuant to 42 U.S.C. § 2000e-5(f)(3).

### ADMINISTRATIVE PREREQUISITE

4. Plaintiff has fulfilled all conditions precedent to the institution of this action under 42 U.S.C. § 2000e, *et seq*. A Notice of Right to Sue was issued on January 30, 2020, a true and correct copy of which is attached hereto.

## PARTIES

5.  Plaintiff, Ariel Schlosser, is an adult female individual and citizen of the United States who resides in Suffolk, Virginia.

6.  At all relevant times, Ms. Schlosser (hereinafter referred to as "Plaintiff" or "Ms. Schlosser") was an employee of VRHabilis, LLC (hereinafter referred to as "Defendant" or "VRH"), within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(f).

7.  Defendant is a limited liability corporation or similar business entity and regularly conducts business at 11124 Kingston Pike, Ste. 119-404, Knoxville, Tennessee 37934-2863.

8.  At all relevant times, Defendant was an "employer" engaged in commerce or in an industry or activity affecting commerce and employed fifteen (15) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

9.  Defendant provides unexploded ordinance ("UXO") range and land remediation, precision blasting, environmental cleanup, and rapid response, both under water and on land.[1]

10. Defendant seeks contracts to remove UXO from former military ranges so the space may once again be used by the public.

11. Defendant employs a dedicated, fulltime staff of 10-15 employees at its principal place of business.

12. For each project or contract, Defendant hired the necessary number of employees to perform the work at the project site.

13. Defendant often re-hires people who have previously worked on other VRH projects.

---

[1] https://www.linkedin.com/company/vrhabilis-llc/about/

14. In 2012, Ms. Schlosser studied for and received a Commercial Diving Certification at the Commercial Diving Academy in Jacksonville, Florida.

15. Ms. Schlosser was one of only 2-3 females out of approximately 150 divers at the academy.

16. From July 2012 through June 2015, Ms Schlosser worked as a Diver/Dive Tender on several jobs including Pacific Diving Industries, Phoenix International Holdings, Inc., Elite Divers and Marine Services, Blackwater Divers, Inc., and Precon Marine.

17. In early 2015, Ms. Schlosser studied for and received UXO certification at the Peak Technical Institute.

18. In October 2015, Ms. Schlosser completed her first UXO assignment with Sterling Global Operations, Inc. in Kodiak, Alaska.

19. In April 2016, Ms. Schlosser applied for a position with Defendant.

20. On April 12, 2016, Ms. Schlosser received a Facebook message from Ben Roberts, a former classmate of hers at the Commercial Diving Academy, who was working for Defendant.

21. Mr. Roberts told Ms. Schlosser he had to vouch for her because Defendant "was wary of hiring a female" and he "told them [Ms. Schlosser] is about as far from female stereotype as you can get."

22. On May 4, 2016, Ms. Schlosser received an "offer of employment" from Defendant for the VRHabilis Cape Poge project located at Martha's Vineyard, Massachusetts.

23. The offer of employment stated Ms. Schlosser was being hired as a "Diver, Standby Diver, Tender and UXO Technician I."

24. Ms. Schlosser, and other divers, are placed on a rotation between diving, standby diving, and tending.

25. While performing diving duties, Ms. Schlosser would be paid $73.09 per hour; while performing standby diving she would be paid $69.25 per hour; and while performing tending duties she would be paid $61.53 per hour.

26. Ms. Schlosser accepted the offer of employment that same day.

27. According to co-workers, Ms. Schlosser was the first female diver ever hired by Defendant.

28. Prior to the start of the Cape Poge project, a fellow diver for Defendant, Chester Prince III ("Mr. Prince"), overheard Site Manager Paul Baril, Project Manager Ron Madden and UXO Tech II Diver Nate Meraz expressing concerns about working with a woman, stating it is "nothing but trouble."

29. Ms. Schlosser's first day of work for Defendant was May 23, 2016.

30. Ms. Schlosser was immediately subjected to disparate treatment based on her sex.

31. On the first day, the head of diving operations, Scott Alonga, requested that Ms. Schlosser perform a knot test in order to determine whether she knew how to tie specific types of knots.

32. According to Mr. Prince, "In my 12 years of working in this field, I have never seen anyone else have to perform this kind of test, and none of my male coworkers at VRHabilis had to perform such a test."

33. Later, this requested knot test was used ass purported evidence that Ms. Schlosser "Lack[ed] willingness to assist team in dailt performance of duties" by Mr. Alonga.Ms.

34. On numerous occasions, Ms. Schlosser was singled out and/or punished more severely for mistakes that her male co-workers made with impunity.

4

35. At some point during the Cape Poge project, Ms. Schlosser accidently got the work vehicle stuck in the mud while driving to the restrooms.

36. After this incident, Defendant's management prohibited Ms. Schlosser from driving any of the vehicles on the job site.

37. According to Mr. Prince,

> "[W]e all got the vehicles stuck all the time: one of the workers who is now in management (Heath Nettleton) backed a vehicle into a tree and damaged the vehicle, but he was still permitted to drive. Ms. Schlosser was the only worker that had that privilege taken away."

38. Ms. Schlosser was also criticized for being on her phone while she was working as a "tender."

39. According to Mr. Prince, "other men were often on their phones while tending…Once again, Ms. Schlosser was the only employee who was reprimanded and berated for this."

40. Ms. Schlosser was berated because she left her clothes in the bathroom after taking a shower.

41. Men frequently left their clothes and dishes all around the house but were never berated the way Ms. Schlosser was.

42. On the second day of operations, May 25, 2016, Ms. Schlosser was permitted to dive.

43. This was Ms. Schlosser's first job with Defendant, as well as her first time performing commercial diving in the context of unexploded ordinance removal.

44. Despite this, Ms. Schlosser's supervisor did not provide any guidance or direction for her first dive.

45. During her first dive, Ms. Schlosser had to resurface to add more weight to her belt and become acclimated to the water conditions.

5

46. Based on this lone mistake, Defendant's management team determined Ms. Schlosser should be prevented from diving "until production picks up."

47. Travis Watts, a seasoned diver who was new to the company, also underweighted his belt during his first dive.

48. Mr. Watts was allowed to continue diving.

49. Ms. Schlosser was the only employee who was singled out and prevented from diving.

50. Ms. Schlosser was also prevented from performing standby diver duties.

51. As a result, Ms. Schlosser was only permitted to perform tending duties.

52. According to Tyler Sanders ("Mr. Sanders"), Ms. Schlosser's dive supervisor, "industry standard in commercial diving is for employees to rotate between these three positions [divers, standby divers, and tenders]. This policy ensures adequate rest time, opportunities to develop diving skills, and equal pay for all employees."

53. That same week, Defendant's Chief Operation Officer Elliot Adler, gave Ms. Schlosser a negative oral performance evaluation.

54. During this performance evaluation, Ms. Schlosser was told she would not be diving because she "wasn't pulling her weight."

55. On or around June 10, 2016, Mr. Adler gave Ms. Schlosser a positive oral performance evaluation.

56. During this performance evaluation, Ms. Schlosser was told she took the criticism from the former week "the right way" and she would be permitted to dive "when production picks up."

57. On June 15, 2016, Ms. Schlosser asked Mr. Sanders if she would be diving that day.

6

58. Mr. Sander's responded by telling Ms. Schlosser to "shut the f*** up" and berated her.

59. Mr. Sanders cursed Ms. Schlosser out and belittled her multiple times during that day.

60. Mr. Sanders had previously been directed by Elliot Adler and Ron Madden to keep Ms. Schlosser from diving without explaining why.

61. On June 17, 2016, Ms. Schlosser sent an email to Defendant's Human Resources, Diane Backes ("Ms. Backes") about the "recurrent harassment by my superior" and "daily verbal abuse" by Mr. Sanders.

62. Ms. Schlosser had previously reported her issues to the highest ranking person at the site, Paul Baril, to no avail.

63. Mr. Sanders later indicated his outbursts at Ms. Schlosser were largely the result of the frustration he experienced because of Defendant's management team's failure to tell Ms. Schlosser directly that she would not be permitted to dive.

64. Mr. Sanders acknowledged Ms. Schlosser was "absolutely capable of diving, but after she showed some initial weakness, she was denied opportunities to get in the water" and "Her male team members who showed similar weaknesses were not prevented from diving the way Ms. Schlosser was."

65. Shortly after Ms. Schlosser reported the harassment, Defendant moved Ms. Schlosser to the team supervised by John Bigos.

66. Up to this point, Ms. Schlosser had not been permitted to dive in over a month.

67. Defendant's management team continued to direct its dive supervisors that Ms. Schlosser was not to be put in the diving rotation.

7

68. On June 28, 2016, Ben Roberts told Ms. Schlosser "not to tell anyone" but to bring her dive equipment to work the next day so they could "get her in the water."

69. Despite Defendant's management team's direction that Ms. Schlosser not be permitted to do so, her male co-workers wanted to give her opportunities to dive.

70. Ms. Schlosser began diving with her new team.

71. Ms. Schlosser made seven (7) dives between June 29, 2016 and July 18, 2016.

72. On June 29, 2016, in only her second time in the water, Ms. Schlosser dove for 6.7 hours.

73. In six (6) of these dives, Ms. Schlosser was paired with Aaron Brouse.

74. Ms. Schlosser outperformed Mr. Brouse by spending almost 7 more hours in the water than he did during those six (6) dives.

75. Mr. Brouse complemented Ms. Schlosser stating, "Wow, I guess you can dive."

76. On her one other dive, Ms. Schlosser was paired with Ben Roberts.

77. Ms. Schlosser outperformed Mr. Roberts 272 minutes to 100 minutes.

78. The dive logs show Ms. Schlosser's time in the water was equal to, if not better, than male employees with comparable experience in the field and more experience with the company.

79. According to Mr. Prince, "Based on my observations, I believe there were male divers who had lower production than Ms. Schlosser. However, these men were not prevented from diving: only Ms. Schlosser was."

80. On July 19, 2016, Ms. Schlosser was verbally attacked by Aaron Brouse calling her a "slimy bitch," a "piece of shit," mocking her when she told him to leave her alone.

81. Mr. Brouse then yelled at Ms. Schlosser, "You want to f*** with me? Bring it on, Bitch," "They'll fire you before they fire me."

82. Mr. Brouse also told Ms. Schlosser he would make her life "a living hell."

83. Ms. Schlosser's dive supervisor, John Bigos, witnessed these altercations but did not intervene or stop Mr. Brouse's harassment of Ms. Schlosser.

84. Sometime between July 18, 2016 and July 23, 2016, Defendant's management team learned Ms. Schlosser had been diving.

85. On July 23, 2016, Heath Nettleton told Ms. Schlosser that management found out about her diving and directed them not to let her dive anymore.

86. Ms. Schlosser asked her supervisor, John Bigos, to confirm Mr. Nettleton's claim.

87. Mr. Bigos directed Ms. Schlosser to address her concerns with Site Manager Paul Baril.

88. Mr. Baril told Ms. Schlosser that COO Elliott Adler did not want her to dive.

89. Later that day, Mr. Baril reprimanded Mr. Nettleton for telling Ms. Schlosser that management did not want her to dive.

90. Mr. Nettleton encouraged Ms. Schlosser to take legal action.

91. Mr. Nettleton told Ms. Schlosser Defendant's refusal to allow her to dive was based on her gender because her performance was on par with the men.

92. On July 24, 2016, Project Manager Ron Madden emailed John Bigos and Tyler Sanders informing them that Ms. Schlosser should not be diving for at least the next 2 weeks.

93. Mr. Madden directed, "No fair rotation system should be in play; the highest performers will be the divers."

94. Ms. Schlosser was the only employee who was explicitly prevented from diving.

95. On July 27, 2016, Mr. Brouse again verbally attacked Ms. Schlosser because he believed Ms. Schlosser was staring at him.

9

96. Mr. Brouse approached Ms. Schlosser in a threatening manner, yelled at her, called her a "piece of shit" and berated her.

97. Ms. Schlosser's dive supervisor, John Bigos, was present for this altercation and again failed to intervene.

98. Heath Nettleton was present and told Mr. Brouse to "knock it off" and leave Ms. Schlosser alone.

99. Defendant alleged Ms. Schlosser was not permitted to dive because of alleged performance issues.

100. Defendant then gave Ms. Schlosser one opportunity to prove she was capable of diving; when she did not perform perfectly, she was denied any further opportunity to prove herself.

101. From that point forward, Defendant directed its supervisors not to permit Ms. Schlosser to dive or be standby diver.

102. The only other diving opportunities she received during her employment came, at the insistence of her co-workers, behind Defendant's management team's back.

103. When she did get that opportunity, her dive logs showed she was performing as well as, if not better than, comparably experienced divers.

104. Mr. Prince, who at the time had 12 years' experience as a commercial diver, acknowledged Ms. Schlosser was "entirely capable of doing the work at hand, including diving."

105. Mr. Prince agreed Ms. Schlosser "was treated very differently than the men, and it seemed clear that upper management did not believe in her diving abilities or hold her to the same standards as male employees."

106. Ms. Schlosser's first dive supervisor, Tyler Sanders, acknowledged Ms. Schlosser "was absolutely capable of diving" but "was quickly singled out by upper management to be prevented from diving."

107. Mr. Sanders also "saw that this treatment of Ms. Schlosser ha[d] a detrimental effect on her, as she was not given opportunities to show her skills or improve upon them."

108. This disparate treatment also made Ms. Schlosser, the only female employee, the lowest paid employee on the team since she was performing tender duties full time.

109. As a tender, Ms. Schlosser earned $11.56 less per hour than a diver, and $7.72 less per hour than a standby diver.

110. Ms. Schlosser was subjected to disparate treatment based on her sex throughout the entirely of her employment.

111. She was subjected to severe verbal and mental abuse by supervisors and some co-workers.

112. Defendant's supervisors and managers were aware of, and witnessed, the verbal and mental abuse but failed to intervene.

113. On July 29, 2016, feeling she could no longer handle the disparate treatment and hostile work environment, Ms. Schlosser resigned.

114. Ms. Schlosser was constructively discharged.

## COUNT I – VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2
## (SEX DISCRIMINATION)

115. Plaintiff hereby re-alleges the forgoing paragraphs as though fully set forth herein.

116. Plaintiff is a female and a member of a protected class under Title VII of the Civil Rights Act.

117. Plaintiff was qualified for her position.

118. Plaintiff was subjected to disparate treatment because of her sex in violation of Title VII of the Civil Rights Act.

119. Defendant is vicariously liable for the actions of its management and supervisors.

120. As a direct and proximate result of the actions of Defendant set forth above, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and anguish.

121. As a direct and proximate result of such actions, Plaintiff has been, is being and will be in the future, deprived of income in the form of wages and of prospective benefits due to the Plaintiff solely because of Defendant's conduct.

## COUNT II- VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2
## (HOSTILE WORK ENVIRONMENT)

122. Plaintiff hereby re-alleges the forgoing paragraphs as though fully set forth herein.

123. Plaintiff is a female and member of a protected class under Title VII of the Civil Rights Act.

124. Plaintiff was subjected to unwelcome harassment.

125. The harassment was based upon Plaintiff's sex.

126. The harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment and to create a hostile work environment.

127. Defendant is vicariously liable for the actions of its management and supervisors.

128. Defendant created intolerable working conditions, as perceived by a reasonable person, and did so with the intention of forcing Plaintiff to quit.

129. Plaintiff was constructively discharged due to the ongoing beratement, harassment, and adverse changes in her employment including discriminatory pay and dive time.

130. As a direct and proximate result of the actions of Defendant set forth above, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and anguish.

131. As a direct and proximate result of such actions, Plaintiff has been, is being and will be in the future, deprived of income in the form of wages and of prospective benefits due to the Plaintiff solely because of Defendant's conduct.

### **COUNT III- VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3 (RETALIATION)**

132. Plaintiff hereby re-alleges the forgoing paragraphs as though fully set forth herein.

133. Plaintiff engaged in protected activity under Title VII by complaining about sex discrimination to her superiors and Defendant's human resources department.

134. Defendant took adverse employment actions against the Plaintiff in constructively discharging her from employment.

135. Pursuant to 42 U.S.C. § 2000e-3, Plaintiff was entitled to engage in and assert protected activities and rights without retaliation.

136. A causal link exists between Plaintiff engaging in protected activity and her constructive discharge.

137. As a direct and proximate result of the actions of Defendant set forth above, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and anguish.

138. As a direct and proximate result of such actions, Plaintiff has been, is being and will be in the future, deprived of income in the form of wages and of prospective benefits due to the Plaintiff solely because of Defendant's conduct.

**WHEREFORE**, Plaintiff requests this court enter judgment in favor of the Plaintiff and against Defendant, for:

(1) all amounts of back pay, front pay, wages, employment benefits, or other compensation denied or lost by Plaintiff as a result of Defendant's adverse actions against Plaintiff;

(2) a judgment against the Defendant for damages, both compensatory and punitive, in an amount to be determined at trial;

(3) a tax offset to neutralize the tax burden of any award;

(3) attorney's fees, interest and costs; and

(4) any such other legal or equitable relief as may be appropriate or to which she may be entitled under federal or state law.


Respectfully Submitted,

**THE EMPLOYMENT & CONSUMER LAW GROUP**

 **/s/ G. BRANDON HALL**
**G. BRANDON HALL, BPR No. 034027**
**CURT M. MASKER, BPR No. 037594**
1720 West End Ave., Suite 402
Nashville, TN 37203
(615) 850-0632

*Attorneys for Plaintiff*